# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1720V

|  |  |
|---|---|
| MICHAEL MANTAGAS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: June 14, 2023 |

*Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Jamica Marie Littles, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

  On December 1, 2020, Michael Mantagas filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of the influenza ("flu") vaccine administered in his left deltoid on November 18, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). Although a ruling on entitlement in Petitioner's favor was issued in April 2022, the parties have been unable to resolve damages on their own.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$75,715.00 (representing $75,000.00 for actual pain and suffering, plus $715.00 for actual unreimbursed expenses).**

### I. Procedural History

Alongside his petition, Mr. Mantagas filed the medical records and the signed declaration[3] required under the Vaccine Act. Exhibits ("Exs.") 1-7, filed Dec. 1, 2020, ECF No. 1; *see* Section 11(c). On January 15, 2021, Petitioner's filings were deemed sufficiently complete, and the case was assigned to the SPU (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 8.

While awaiting Respondent's tentative position, Petitioner filed a final exhibit of medical records. Ex. 8 filed Aug. 23, 2021, ECF No. 15. Respondent filed his Rule 4(c) Report conceding Petitioner was entitled to compensation on April 1, 2022, and a Ruling on Entitlement was issued on April 4, 2022. ECF Nos. 21-22. Petitioner provided additional information about his treatment course. Status Report filed May 19, 2022, ECF No. 25; Ex. 9 – Supplemental Declaration, filed May 25, 2022, ECF No. 26. Petitioner then rejected Respondent's proffer on pain and suffering, and the parties briefed the issue. Status Report filed May 27, 2022, ECF No. 27; Petitioner's Memorandum ("Brief") filed Aug. 1, 2022, ECF No. 28; Respondent's Memorandum ("Response") filed September 30, 2022, ECF No. 29; Petitioner's Memorandum ("Reply") filed Oct. 31, 2022, ECF No. 30. The matter is now ripe for adjudication.

### II. Authority

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

---

[3] Rather than affidavits, both statements provided by Petitioner (Exs. 2, 9) are signed under penalty of perjury pursuant to 28 U.S.C.A. § 1746.

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### III.     Prior SIRVA Compensation Within SPU[5]

#### A.  Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2023, 3,031 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,950 of these cases, with the remaining 81 cases dismissed.

Of the compensated cases, 1,677 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 148 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

1,501 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 1,273 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[7] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *148* | *1,501* | *28* | *1,273* |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,382.97 | $65,000.00 | $90,000.00 | $40,000.00 |
| **Median** | **$93,649.92** | **$85,000.00** | **$122,886.42** | **$56,250.00** |
| **3rd Quartile** | $125,000.00 | $112,654.00 | $161,001.79 | $82,500.00 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 148 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to

---

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

5

30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## IV.   Appropriate Compensation for Petitioner's Pain and Suffering

### A. Consideration of the Evidence

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult, with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In performing this analysis, I have reviewed the record as a whole, including all medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I also have taken into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and rely upon my experience adjudicating these cases. However, I base my ultimate determination on the specific circumstances of this case.

Upon receiving the subject vaccination in his left arm at a local pharmacy on November 18, 2019, Michael Mantagas was 37 years old. Ex. 1 at 4-5. His medical history included asthma and sleep apnea, but no musculoskeletal complaints. Ex. 3 at 16-18. He was employed as a project manager for a security company, married, and caring for one young child, with another on the way. Ex. 4 at 8; Ex. 9 at ¶ 4.

53 days after vaccination (and hence a little less than two months), on January 10, 2020, Petitioner established care with Robert W. Borzio, M.D., at Orthopedic Sports Medicine and Rehabilitation Center, P.A. Ex. 4 at 8.[9] He reported left shoulder and upper arm pain ever since the vaccination, currently rated 8/10, and worsening. *Id.* The pain

---

[9] Petitioner later confirmed that he was not previously under the care of the orthopedic specialist and that he made the appointment directly, without a referral. Status Report filed May 19, 2022, ECF No. 25.

6

was exacerbated while bending, lying in bed, and lifting (requiring activity restrictions at work). *Id.* Dr. Borzio recorded that his exam found no swelling or tenderness. *Id.* There was "full motion, though pain with flexion over the head, horizontal adduction, and internal rotation," "pain on testing of the rotator cuff," but no impingement signs. *Id.* Petitioner's strength was 5/5. *Id.* An x-ray showed no fracture, dislocation, or arthritis. *Id.* Dr. Borzio assessed a likely rotator cuff tear, for which he prescribed meloxicam (15 mg) and referred to physical therapy ("PT"). *Id.*

At his January 17, 2020, PT initial PT evaluation, Petitioner reported pain ranging from 6 to 9/10. Ex. 5 at 5. He was unable to tolerate overhead activity or repetitive use of his left arm at all without pain. *Id.* The injury disrupted his ability to drive, bathe, shower, and complete household tasks. *Id.* On exam, the therapist recorded moderately limited active and passive range of motion, decreased strength (3/5), and positive empty can/ supraspinatus and Hawkins-Kennedy signs. *Id.* The therapist recommended PT three times per week for six weeks, and also suggested exercises to perform at home. *Id.* By the 13th and last session on March 6, 2020, he had "limited symptom relief" and no objective documented progress. Ex. 5 at 41-43 (listing identical "initial" and "current" limitations, decreased range of motion, and weakness). The records do not indicate why PT was discontinued.[10]

Next, the orthopedist Dr. Borzio ordered a June 16, 2020, MRI which visualized "mild supraspinatus tendinosis" and "a low-grade linear tear within the distal fibers of the supraspinatus tendon." Ex. 7 at 1.

At an October 23, 2020, follow-up appointment several months later, Petitioner reported persistent shoulder pain rated at 5/10, and "diligent" adherence to a home exercise program ("HEP"). Ex. 8 at 25. Dr. Borzio's exam findings were unchanged – with full but painful range of motion and no impingement signs. *Id.* at 26. Petitioner was "not currently interested in any surgical intervention." *Id.* He would "check with his GP, because of possible immune system compromise in the setting of COVID pandemic" about Dr. Borzio's suggestion of a cortisone injection. *Id.*[11] Dr. Borzio also recommended restarting formal PT. *Id.*

---

[10] Within Ex. 5, the records are somewhat out of order. Organized chronologically, PT encounters occurred on January 17, 22, 29, and 31; February 6, 7, 13, 14, 19, 20, 26, and 28; and March 4 and 6, 2020. *See generally* Ex. 5.

[11] Dr. Borzio recorded that Petitioner would be consulting his primary care provider about this concern – but that is not documented in the primary care records or corroborated by Petitioner's declarations.

Dr. Borzio then facilitated an October 27, 2020, second opinion with his colleague Jeffrey Van Gelderen, M.D. Ex. 8 at 22. Petitioner reported that his pain had worsened, currently rated 7/10, and was partially relieved with medication. *Id.*[12] Dr. Van Gelderen's exam elicited the same finding of painful but "full" range of motion, and full strength. *Id.* at 23. But unlike Dr. Borzio, Dr. Van Gelderen assessed positive impingement of the left shoulder – for which he prescribed Naprosyn (500 mg) and echoed the recommendation for further PT. *Id.* at 24.

After a lengthy gap in any medical treatment, on June 3, 2021, Petitioner followed up with his original orthopedist Dr. Borzio. Ex. 8 at 17. Petitioner reported a slightly increased pain rating of 8/10. *Id.* Dr. Borzio's exam findings were unchanged. *Id.* at 18. Dr. Borzio wrote another prescription for Mobic (15 mg), and again recommended further PT, as well as a cortisone injection and surgery once Petitioner "f[ound] a shoulder surgeon in network to follow up with." *Id.* at 18. There are no subsequent medical records evidencing Petitioner's ongoing shoulder condition or any additional treatment thereof. *See generally* Exs. 1-8.

In his sworn declaration dated May 18, 2022, Petitioner avers that his initial pain was "consistently around an 8-10 range." Ex. 9 at ¶ 4. The injury disrupted his ability to care for his 1.5-year-old child and his wife, who was 4 months pregnant with their second child. *Id.* The SIRVA also harmed his new job – starting one month later, on December 16, 2019 – as a project manager/ install tech supervisor for a security firm, which involved interstate car travel, on-site meetings, and physical labor. *Id.* at ¶ 5. By January 2020, he concluded that the pain was not going away, researched orthopedists in his area, and presented to Dr. Borzio. *Id.* at ¶ 6. After trying Mobic as prescribed by Dr. Borzio, Petitioner determined that Advil PM was better for his pain. *Id.*

Petitioner recalls that in early March 2020, in light of the emerging COVID-19 pandemic and his high-risk status (due to chronic asthma and diminished lung capacity), he stopped attending in-person PT in favor of the home exercises provided by his therapist. Ex. 9 at ¶ 11. He was included in company-wide layoffs in late March 2020, and struggled to support his family, including his second child who was born in late April 2020. *Id.* at ¶¶ 12-13.[13] While he was rehired in October 2020, the shoulder injury continued to disrupt his work on the computer, traveling, and on-site. *Id.* at ¶ 16. He never resumed in-person PT due to ongoing concern about additional COVID-19 variants, but he has

---

[12] The medical record provides that: "symptoms have improved with muscle relaxers" but the only current medication was Mobic 15 mg once daily. Ex. 8 at 22. Petitioner later confirmed that the reference to "muscle relaxers" was in error. Status Report filed May 19, 2022, ECF No. 25.

[13] Petitioner does not allege that his SIRVA caused or substantially contributed to the termination of his employment, nor has he asserted lost wages as part of his damages demand.

8

continued to perform his home exercises approximately 2-3 times a week, plus stretching and ice/ heat pads daily. *Id.* at ¶ 15. His pain has remained "constant" at between 7 – 10/10, with "slight relief" from Advil PM, which he takes before bed each night. *Id.* at ¶ 17.

Finally, Petitioner stated: "I am going to have a follow up appointment with an orthopedic surgeon in the coming months to explore any further treatments and/or surgery options. It seems to be the one option that might relieve this pain once and for all, but I have a documented and diagnosed phobia of surgical procedures/ anesthesia known as tomophobia which is delaying my decision to move forward at this time." Ex. 9 at ¶ 17. However, no such concern or follow-up attention for the shoulder is reflected in the medical records or the briefing completed in October 2022.

### B. Analysis

Although there is demonstrated delay in seeking initial treatment, Petitioner has provided some credible explanation for this. As noted above, he had hope that the injury would self-resolve; was focused on a new job involving travel, plus care of his infant son and pregnant wife; and he needed time researching an orthopedist in his area. These factors reasonably justify the delay and did not prevent a favorable onset finding – although they also underscore that the initial severity of his injury was likely limited, since he was able to tolerate the condition without treatment. Thus, based on the available evidence, I find that his initial pain was most likely moderate – consistent with the lower end of Petitioner's subjective pain rating (6/10) at his first PT encounter, two months into the course.

The PT records also reflect moderately decreased active and passive range of motion, and moderately decreased strength. Thirteen (13) PT sessions over seven weeks, ending in early March 2020, did not deliver improvement. Petitioner has also credibly addressed the subsequent treatment gap – citing emergence of the COVID-19 pandemic (coinciding with his discontinuation of formal PT), termination from his job, the birth of his second child, and "diligent" maintenance of a home exercise program. I accept that his injury remained moderately severe, featuring neither improvement nor exacerbation, throughout the gap in treatment and up to October 2020.

Thereafter, however, Petitioner elected to continue with a conservative course. I recognize his ongoing concerns about in-person PT as additional COVID-19 variants emerged – but the record does not contain any continued communications with his physical therapist or address the potential of telehealth. Despite his own apparent concerns, no medical provider recorded that he was an inappropriate candidate for a cortisone injection (suggested by the two orthopedists) or that he had a diagnosed phobia

of medical procedures (as stated in his affidavit). The imaging findings of "mild" tendinosis and a "low-grade" tear also point towards a relatively less severe injury. Based on the June 2021 assessment by the established orthopedist, I recognize that Petitioner had ongoing pain leading to pain-protective behavior and thus, decreased range of motion at that time. There is again, no evidence of improvement or an intervening cause – meaning that the injury can still be attributable to his SIRVA. But his subjective assessment of severe pain is not consistent with the available evidence.

In sum, I find that Petitioner has established a moderately severe injury for 11 months, which persisted at a milder level for another 18 months (covering the second gap in treatment, and up to Petitioner's sworn declaration).

Petitioner seeks an award of $95,000.00, averring that his pain and suffering is equivalent to that established in *Accetta*. Brief at 7.[14] Petitioner reasons that he treated for a shorter period of time but had less gaps in treatment and suffered a more intense injury, and similarly received but declined medical providers' recommendations of a cortisone injection and surgery. *Id.* at 7-8. However, *Accetta* featured a SIRVA which was "moderately more severe than that experienced by many other similarly situated petitioners who did not undergo surgery." *Accetta*, 2021 WL 1718202, at *3. The MRI reflected significant findings including severe tendinopathy and several tears. *Id.* And I recognized that the petitioner's "past work as a physical therapist likely made her confident she could self-treat her symptoms" during the initial period and the subsequent gaps in treatment. *See id.* at *3 and n. 10, *5.

Petitioner also avers that he suffered more than the *Russano* petitioner, who "experienced rapid recovery after beginning physical therapy, experiencing 80 percent improvement within eight months," and "was not recommended for surgery." Brief at 7, 8.[15] However, the *Russano* petitioner had a more severe initial injury and required more focused treatment sooner in time. 2020 WL 3639804, at *2-4. I also accepted that preexisting medical conditions enhanced the pain and suffering in *Russano*, while making no such finding here. *Id.* at *4.

---

[14] Citing *Russano v. Sec'y of Health & Hum. Servs.*, No. 18-0329V, 2020 WL 3639804 (Fed. Cl. Spec. Mstr. June 4, 2020) (awarding $80,000.00 for actual pain and suffering); *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202 (Fed. Cl. Spec. Mstr. March 31, 2021) ($95,000.00).

[15] Citing *Russano v. Sec'y of Health & Hum. Servs.*, No. 18-0329V, 2020 WL 3639804 (Fed. Cl. Spec. Mstr. June 4, 2020) (awarding $80,000.00 for actual pain and suffering).

Respondent has proffered $52,500.00. Response at 10. In support of this figure, Respondent avers that Petitioner's course is more like those seen in *Ramos* and *Mejias*, which each featured "limited conservative treatment, no cortisone injections or surgery, fewer than 15 PT sessions, and treatment gaps." Response at 10.[16] Respondent avers that his proffer "account[s] for the fact that Petitioner presented for care two months faster than the petitione[r] in *Ramos*[,] but also had an 11-month treatment gap, reducing his injury course to eight months overall." *Id.* at 11.[17] However, Petitioner correctly notes that those are two of the lowest reasoned opinions on SIRVA pain and suffering in the Program – and that even despite Petitioner's treatment gaps, that he has demonstrated a higher level of pain over a much longer period of time. Reply at 1-2.

Respondent states that his "analysis is also generally consistent with the Court's rulings" in *Rayborn* and *Norton*, Response at n. 5.[18] In each case, the vaccinee was relatively young and healthy prior to vaccination, and demonstrated "mild to moderate symptoms for approximately nine months." *Rayborn*, 2020 WL 5522948, at *12; *Norton*, 2021 WL 4805231, at *6. Another case, *Couch*,[19] features a similar course, but starting with a fall 2019 vaccination. *See also* Response at n. 4 (citing *Couch* for the analysis of "disruptions in treatment related to the COVID-19 pandemic").

As noted above, I have concluded that Petitioner suffered a more significant injury which was initially complicated by the Pandemic, and persisted over a longer period of time. Based on my careful review of the case evidence and in my experience, I find that $75,000.00 is an appropriate award for Petitioner's actual pain and suffering. I am opting for the virtual mid-point between the parties' proposed sums. Although I do not in making damages determinations operate from the principal that "meeting in the middle" is the best solution to resolving these kinds of disputes, *in this particular case* the number I embrace is.

---

[16] Citing *Mejias v. Sec'y of Health & Hum. Servs.*, No. 19-1944V, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 10, 2021) (awarding $45,000.00 for actual pain and suffering); *Ramos v. Sec'y of Health & Hum. Servs.*, No. 18-1005V, 2021 WL 6588576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) ($40,000.00).

[17] Respondent suggests that *Mejias* also involved an initial delay of four months prior to the first medical treatment for SIRVA. Reply at 11. In fact in *Mejias*, the petitioner sought medical care for his SIRVA two days, and again 10 days post-vaccination. *Mejias*, 2021 WL 5895622, at *3-4.

[18] Citing *Rayborn v. Sec'y of Health & Hum. Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (awarding $55,000.00 for actual pain and suffering); *Norton v. Sec'y of Health & Hum. Servs.*, No. 19-1432, 2021 WL 4805231 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) ($55,000.00).

[19] *Couch v. Sec'y of Health & Hum. Servs.*, No. 20-1246V, 2022 WL 4453921 (Fed. Cl. Spec. Mstr. Aug. 24, 2022) (awarding $55,000.00 for actual pain and suffering).

**Conclusion**

Based on the record as a whole and the parties' arguments, I award Petitioner a lump sum payment of **$75,715.00 (representing $75,000.00 for actual pain and suffering,[20] plus $715.00 for actual unreimbursed expenses).[21]** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[22]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[20] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[21] The parties have stipulated to the expenses. Brief at n. 1; Response at 2.

[22] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.